John Oleske, Esq.
HERRICK, FEINSTEIN LLP
Attorneys for Plaintiff
2 Park Avenue
New York, NY 10016
Telephone:    (212) 592-1400
Facsimile:    (212) 592-1500
joleske@herrick.com

COPY

JUDGE ROBINSON CIV 4756

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
At Last Naturals, Inc.,                           :    Case No.
                                                  :
                         Plaintiff,               :    **COMPLAINT**
                                                  :
            vs.                                   :
                                                  :
Bruce Last and Lasting Natural Solutions, Inc.,   :
                                                  :
                         Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RECEIVED
MAY 21 2008
U.S.D.S.D.N.Y.
CASHIERS

Plaintiff At Last Naturals, Inc., by its attorneys, Herrick, Feinstein LLP, as and for

its complaint against defendants Bruce Last and Lasting Natural Solutions, Inc., alleges as

follows:

### NATURE OF THE ACTION

1.      This is an action for breach of a severance agreement and for trademark

infringement.  Defendant Bruce Last ("Last") is a former employee of plaintiff, who, when his

employment terminated on February 22, 2007, signed a severance agreement.  In that agreement,

defendant agreed, among other things, not to compete with plaintiff for nine months, and not to

use plaintiff's confidential information or proprietary formulations at any time.  In exchange,

plaintiff agreed, among other things, to pay Last $50,000 and twelve months of health benefits.

2.      Plaintiff has now discovered that immediately after signing the severance

agreement, Last breached it.  Specifically, Last incorporated a directly-competing business,

registered an internet domain name for that business, created advertising materials for that business, caused that business to join and maintain membership in a trade association, and then used that business to sell products incorporating plaintiff's confidential information and proprietary formulations.

3.     Moreover, as part of Last's efforts to promote his competing business, he selected a company name, domain name and logo that were clearly intended to confuse consumers, vendors, and competitors.  The competing company is called "Lasting Natural Solutions, Inc.," as compared to "At Last Naturals, Inc.," and employs a stylized leaf as its logo, distinguished from At Last's federally-registered, trademarked leaf logo only by a more vertical orientation.

4.     As a result of Last' breach of contract and intentional trademark infringement, plaintiff has suffered damages including, but not limited to, the payments made to defendant pursuant to the Severance Agreement, loss of business due to Last's prohibited competition, and the consumer confusion and tarnishment resulting from the intentional misuse of plaintiff's federally-registered trademarks.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that defendant resides in this district, and in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## PARTIES

7.       Plaintiff At Last Naturals, Inc. (the "Company") is a New York corporation with its principal place of business at 401 Columbus Avenue, Valhalla, New York 10595.

8.       Defendant Bruce Last ("Last") is a resident of New York, with his residence at 187 Scarsdale Road, Tuckahoe, New York 10707.

9.       Defendant Lasting Natural Solutions, Inc. ("LNS") is a New York corporation with its principal place of business at 187 Scarsdale Road, Tuckahoe, New York 10707.

## FACTUAL ALLEGATIONS

*Background - Last's Prior Employment by Plaintiff*

10.      From approximately November 15, 2000 through February 2007, Last was employed as the President of the Company, and at various times was either a one-third or one-half owner.

11.      During February 2007, Last and the Company determined that their mutual interests would be best served by a total separation of Last from the Company. Over the course of that month, Last and the Company negotiated the terms for such a separation, with the understanding that under the terms of any agreement, Last would be prohibited from competing with the Company for a certain period of time, and would be barred from using the Company's confidential and proprietary information and trade secrets at any time.

*Last Resigns and Signs the Severance Agreement*

12.      On February 22, 2007, the parties agreed to a Severance Agreement and General Release (the "Severance Agreement"). (A copy of the Severance Agreement is attached

hereto as Exhibit A.)  Pursuant to the Severance Agreement, Last agreed to resign from the

company, accept certain restrictions on his post-termination activities, and release all claims, in

exchange for a $50,000 severance payment and a 12-month continuation of his health insurance

benefits.

13.      Among the specific restrictions Last agreed to was a prohibition on his

use or dissemination of any of the Company's confidential or proprietary information or trade

secrets:

### 3.    Confidential Information.

A.      Last acknowledges that, during his employment
with the Company, he has had access to or participated in the
development of confidential or proprietary information and trade
secrets related to the Company's business, *including, without
limitation,* (i) *formulas*, patents, business plans, operating plans,
marketing plans, strategic planning, financial reports, operating
data, budgets, wage and salary rates, pricing strategies and
information, terms of agreements with suppliers or customers and
others, customer or client lists, devices, software programs,
reports, banking records, litigation records, marketing information,
information received from third parties under confidentiality
conditions, correspondence, tapes, discs, electronic information
and records, tangible property and specifications owned by or used
in the Company's business, operating strengths and weaknesses of
the Company's managers, officers, employees, agents, suppliers,
clients and customers, *and/or* (ii) *information pertaining to future
developments, including, without limitation, research and
development of products, services and processes*, future
marketing, distribution, delivery or sales plans or ideas, and
potential new distribution or business locations, and (iii) other
electronic, tangible and intangible property, that are used in the
business and operations of the Company but not made publicly
available (collectively, the "Confidential Information").  The
Confidential Information shall include any and all of the foregoing
regardless of whether such Confidential Information is written,
graphic, electronic, recorded, photographic or in any machine-
readable form provided to Last.

4

> B. **_Last agrees that he will not directly or indirectly, disclose, use or make known for his or another's benefit any Confidential Information of the Company._**

(Exhibit A ¶ 3) (underlining in original; other emphasis added).

14.     With respect to the restrictive covenants, Last specifically agreed not to compete with the Company for a period of nine months:

> 5.     **Noncompetition and Nonsolicitation.**
>
> A.     In exchange for and in consideration of the covenants and promises contained herein (including, without limitation, the compensation and benefits provided in Paragraph 1 above), Last agrees that for a period of nine (9) months after the date of this Severance Agreement (the "Non-Competition Period"), **_he will not, directly or indirectly own_** (other than an entity in which Last has an interest of less than 1% and the securities of which are publicly traded), **_manage, operate, engage in, control, be employed by, advise, consult with or participate in or be connected with any entity owning or having a financial interest in, act as a lender to, whether direct or indirect, in a Competing Business (as defined below)_**...
>
> *    *    *
>
> _For purposes of this Severance Agreement, a "Competing Business" shall mean any entity which develops, manufactures, distributes, or sells products which compete with those products developed, manufactured, distributed, or sold by the Company._
>
> For purposes of this Severance Agreement, **_an "indirect" interest is presumed to exist if an interest is held by a spouse_**, life partner, parent or child, in addition to any other forms of indirect or beneficial interest.

(Exhibit A ¶ 5) (underlining in original; other emphasis added).

**_Last Breaches the Severance Agreement_**

15.     On March 5, 2007, Last incorporated Lasting Natural Solutions, Inc. ("LNS"), and caused LNS to be registered with the New York Department of State Division of

Corporations, in direct violation of Paragraph 5 of the Severance Agreement. (A copy of the Division of Corporations' listing for LNS is attached hereto as Exhibit B.)

16.    On March 11, 2007, upon information and belief, Last purchased a registration for the domain name www.Lastingnaturals.com from the GoDaddy.com domain-registration service, also in direct violation of Paragraph 5 of the Severance Agreement. (A copy of the domain registration entry for the www.Lastingnaturals.com domain name is attached hereto as Exhibit C.)

17.    Upon information and belief, at or around the same time, Last had business cards printed that bore the name "Lasting Natural Solutions, Inc." and included a stylized-leaf logo that closely resembles the trademarked logo used by the Company. The business card identified Last as the president of LNS, listed his home address as LNS' business address, and listed his cell phone number (which he had previously used as his business phone with the Company) as LNS's business phone. (An enlarged copy of the business card is attached hereto as Exhibit D.) Last's creation of the business card was in direct violation of Paragraph 5 of the Severance Agreement.

18.    On or about April 2007, Last caused LNS to pay at least $662 to join the Personal Care Products Council ("PCPC") (formerly the Cosmetic, Toiletry and Fragrance Association ("CTFA")), as an "Active Member." According to its website, the PCPC "is the leading national trade association for the cosmetic and personal care products industry and represents the most innovative names in beauty today" and has over 600 members, of which the Company is one. (A copy of the PCPC website's "About Us" page is attached hereto as Exhibit E.)

19.    Despite Last's claims that LNS, which he created during the non-competition period, is inactive, it is still listed on the PCPC website as an Active Member, and thus is still being promoted in industry community as a competing business, in direct violation of Paragraph 5 of the Severance Agreement.  (A copy of the PCPC website's "Active Member" roll is attached hereto as Exhibit F.)

20.    Compounding the damage, on or about April 2007, Last caused LNS to purchase an entry in the PCPC's "Who's Who" publication, which was released during the non-competition period in July 2007, an even more obvious attempt to advertise his competing business in direct violation of Paragraph 5 of the Severance Agreement.  (A copy of LNS's 2007 entry in the PCPC Who's Who publication is attached hereto as Exhibit G).

21.    Upon information and belief, between March 2007 and the present, Last has operated LNS as a start-up business in direct competition with the Company, in direct violation of Paragraphs 3 and 5 of the Severance Agreement.

22.    Upon information and belief, Last offered products in categories covered by the non-competition provisions of the Severance Agreement to prospective LNS customers during the nine-month non-competition period to which he had agreed, in direct competition with the Company, and in direct violation of Paragraph 5 of the Severance Agreement.

23.    In addition, upon information and belief, Last has utilized confidential and proprietary product formulations in the manufacture of the products Last offered to prospective customers of LNS, both during and subsequent to the non-competition period, in direct violation of Paragraph 3 of the Severance Agreement.

24.    One example of the basis for the Company's information and belief is Last's admission that in December 2007, he sold, through LNS, approximately $13,800 worth of

competing products to one of the Company's customers, Mr. Nickel Wu. Given that Mr. Wu has bought and then resold large volumes of the Company's products in the past, resulting in an expectation among his customers that he would be consistently delivering products with the same formulations, and given Last's intimate knowledge of those formulations, it is highly unlikely that the formulation of the products Last sold to Mr. Wu differed in any material way from the proprietary, trade-secret formulations used by the Company in its comparable products.

25.     Furthermore, while Last claims the Nickel Wu sale occurred outside the non-competition period, the date the sale was concluded and/or the date delivery was made are not determinative of the issue of whether the *competing transaction as a whole* occurred within that period. This is because the sale of personal-care products requires a ramping up of design and manufacturing well in advance of the actual sale date. In order to deliver products in December, Last would have had to arrange for design and manufacturing months earlier, inside the nine-month non-competition window. Thus, the "December" sale to Nickel Wu was, unavoidably, in direct violation of Paragraph 5 of the Severance Agreement.

26.     That is, unless Last abridged the design and manufacturing process by using the Company's confidential and proprietary information and trade secrets in such a way that he was able to have his competing products manufactured on extremely short notice. In that case, Last directly violated Paragraph 3 of the Severance Agreement.

27.     But, in fact, the Nickel Wu transaction violated Paragraph 5 of the Severance Agreement even if every aspect of that transaction occurred outside of the non-competition window. This is because the sale was made by a business, LNS, that Last admittedly established *within* the non-competition window.

8

28.    On April 28, 2008, Last's counsel represented that the sale to Nickel Wu was the only sale made by LNS, and that it went out of business following that sale. (A copy of defense counsel's April 28, 2008 letter is attached hereto as Exhibit H.)

29.    However, on March 26, 2008, Last sent an email to an employee of the Company, in which he stated:

> Things are great on my end - really great - *my biz is rocking...finally!*

(emphasis added).  Last attached an electronic copy of the LNS business card to this email in which he states that *his* "biz" is "finally" "rocking".  (A copy of the March 26, 2008 email is attached as Exhibit I.)

30.    On May 2, 2008, Last's counsel represented that Last's March 26, 2008 email did not refer to LNS, that Last was in fact conducting no business through LNS at that time, and that the attachment of the business card to the email had been deliberately intended to "bait" the Company's owners.  Instead, Last's counsel claimed, the Last's "biz" was his work with a new employer, as opposed to "his" business that he had been trying to cultivate for some period of time and which was "finally" "rocking".  (A copy of defense counsel's May 2, 2008 letter is attached hereto as Exhibit J.)

31.    Moreover, an email sent to Last on March 19, 2008 by his friend, Hunter Millington, confirms that at least as of that date, one week before the March 26, 2008, Last had not yet secured new employment.  (A copy of the March 19, 2008 email is attached as Exhibit K.)

32.    Also in defense counsel's May 2, 2008 letter, he represented that LNS's membership in the PCPC was set to expire shortly, and that LNS's continuing membership was solely due to the fact that LNS still had time on its membership left over from its initial

registration in 2008. However, PCPC membership is not granted for 12-month intervals based on the time of enrollment, but rather, requires renewals for each calendar year. As a result, LNS's current active membership in the PCPC can only have resulted from Last having renewed LNS's membership for the 2008 calendar year.

33.    Despite the Company's demands, Last has refused to cause the dissolution of LNS, refused to transfer the www.lastingnaturals.com domain name, refused to turn over the materials used in LNS's prohibited and infringing activities, refused to disgorge its ill-gotten profits, refused to substantiate its claims that the products it has sold and/or is selling do not rely on the Company's confidential and proprietary information and trade secrets, and refused to account for the sale admittedly made to Nickel Wu, and refused to substantiate its claim that it has not made other sales in violation of the Severance Agreement.

*Last Infringes on Plaintiff's Trademarks*

34.    On February 26, 2002 and September 10, 2002, the Company was awarded two trademark registrations, one for the words "At Last Naturals" (Trademark Reg. No. 2,543,591),  and one for the stylized version of those words and distinctive, stylized-leaf depiction that together constitute the Company's logo (Trademark Reg. No. 2,618,018). (A copy of the abstracts of registration for the Company's trademarks are attached hereto as Exhibit L.)

35.    The Company has used its trademarks in its business continually and extensively since their registration: on its website, on its printed advertising material, on its invoices, checks and envelopes, and on the labels of its personal care products, among others. The Company's identity in the minds of consumers is strongly associated with these well-established marks.

36.    Last's    actions    in    incorporating    LNS,    registering    the www.lastingnaturals.com domain name, joining and advertising with the PCPC, and producing the business card and any other sales material he used to promote LNS constitute intentional infringement. Last's intent to confuse consumers and take advantage of the Company's goodwill are demonstrated by the close similarity between the two companies' names, the even closer similarity between the Company's name and the domain name LNS registered, and by the obvious similarity between the Company's federally-registered, trademarked stylized-leaf logo and LNS's logo, which was "created" by doing little more than rotating the Company's logo 90 degrees.

37.    Last has conducted business by intentionally using the trademark-infringing company name and logo since March 2007, and continues to do so to this day, as evidenced by the continuing active membership of LNS in the PCPC.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract against Bruce Last)**

38.    The Company repeats and realleges each and every allegation set forth above as if fully set forth herein.

39.    The Severance Agreement represents a valid and binding contract.

40.    The Company has not breached any material terms of the Severance Agreement.

41.    Last's formation of LNS in March 2007 constituted a breach of the Severance Agreement.

42.    Last's registration of the www.Lastingnaturals.com domain name constituted a breach of the Severance Agreement.

43.     Last's enrollment and maintenance of membership of LNS in the PCPC, and his advertisement of LNS in the PCPC's Who's Who publication constituted a breach of the Severance Agreement.

44.     Last's sale of products through LNS constituted a breach of the Severance Agreement.

45.     Last's use of the Company's confidential and proprietary information for the benefit of himself and LNS constituted a breach of the Severance Agreement.

46.     Last's continuing management and operation of LNS constitutes an ongoing breach of the Severance Agreement.

47.     As a result of Last's breaches, the Company has been damaged in an amount to be determined at trial, but in no event less than $200,000, including, but not limited to, the return of Last's $50,000 severance payment, the value of the health benefits paid under the Severance Agreement, and the disgorgement of Last's wrongfully-derived profits.

## SECOND CLAIM FOR RELIEF
### (Intentional Trademark Infringement against Bruce Last and LNS)

48.     The Company repeats and realleges each and every allegation set forth above as if fully set forth herein.

49.     The Company has two valid trademarks, bearing registration numbers 2,543,591 and 2,618,018.

50.     Defendant's incorporation of LNS, his use of the LNS name in commerce, his registration of the www.lastingnaturals.com website, his use of the LNS name in establishing membership in and conducting advertising through the PCPC, and his causing of LNS to use the Company's federally registered trademarks in commerce all evidence an

intentional, willful attempt to confuse consumers as to the identity of LNS's business and the origin of LNS's products.

51.    The Company has been damaged by Last's and LNS's intentional infringement of its trademarks.

52.    As a result of Last's and LNS's intentional trademark infringement, the Company has been damaged in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
#### (Conversion against Bruce Last and LNS)

53.    The Company repeats and realleges each and every allegation set forth above as if fully set forth herein.

54.    Because LNS was incorporated in March 2007 as a Competing Business as defined in the Severance Agreement, in violation of Paragraph 5 of that agreement, any and all sums received by Last and LNS, including the $13,800 received from Nickel Wu, rightfully constitute the assets of Company, which has a possessory right or interest in said property.

55.    Last and LNS are currently exercising dominion over the property, and are otherwise interfering with the Company's recovery of the same.

56.    As a result of Last's and LNS's conversion, the Company has been damaged in an amount to be determined at trial, but in no event less than $13,800.

### FOURTH CLAIM FOR RELIEF
#### (Money Had and Received against Bruce Last and LNS)

57.    The Company repeats and realleges each and every allegation set forth above as if fully set forth herein.

58.    The approximately $13,800 received by Last and LNS is money belonging to the Company.

59.    Last and LNS have benefited from the receipt of the money belonging to the Company.

60.    Under principles of good conscience, Last and LNS ought not be allowed to retain the money belonging to the Company.

61.    As a result of Last's and LNS's receipt of the money belonging to the Company, the Company has been damaged in an amount to be determined at trial, but in no event less than $13,800.

### FIFTH CLAIM FOR RELIEF
**(Unjust Enrichment against Bruce Last and LNS)**

62.    The Company repeats and realleges each and every allegation set forth above as if fully set forth herein.

63.    Last and LNS have received at least $13,800 from their sale of products in direct violation of Last's obligations under the Severance Agreement.

64.    Equity and good conscience do not permit Last and LNS to retain any sums received on account of Last's direct violations of his obligations under the Severance Agreement.

65.    As a result of Last's and LNS's unjust enrichment, the Company has been damaged in an amount to be determined at trial, but in no event less than $13,800.

### SIXTH CLAIM FOR RELIEF
**(Common-Law Unfair Competition against Bruce Last and LNS)**

66.    The Company repeats and realleges each and every allegation set forth above as if fully set forth herein.

14

67.    Last and LNS misappropriated the Company's federally-registered trademarks and proprietary and confidential information and trade secrets for their own commercial advantage.

68.    Last's and LNS's use of the Company's trademarks and proprietary and confidential information and trade secrets was made in bad faith.

69.    As a result of Last's and LNS's unfair competition, the Company has been damaged in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### (Statutory Anti-Dilution against Bruce Last and LNS)
### (N.Y. General Business Law § 360)

70.    The Company repeats and realleges each and every allegation set forth above as if fully set forth herein.

71.    Last and LNS have used and are using the Company's federally-registered trademarks in commerce in New York State.

72.    Last's and LNS's use of the Company's federally-registered trademarks is likely to cause confusion about the source of the infringing products.

73.    As a result of Last's and LNS's dilution of its federally-registered trademarks, the Company has been damaged in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### (Piercing the Corporate Veil against Bruce Last)

74.    The Company repeats and realleges each and every allegation set forth above as if fully set forth herein.

75.    Last completely dominates and controls LNS, which has no separate corporate existence and observes no corporate formalities.

76.    Last has used LNS to commit wrongs against the Company, including, among other things, federal trademark infringement, conversion, money had and received, unjust enrichment, common-law unfair competition, and trademark dilution under the New York General Business Law.

77.    As a result of Last's use of LNS to commit wrongs against the Company, the Company has been damaged in an amount to be determined at trial.

78.    Because LNS is a mere alter-ego of Last, he should be held personally liable for any and all damages assessed against LNS.

## NINTH CLAIM FOR RELIEF
### (Fraud against Bruce Last)

79.    The Company repeats and realleges each and every allegation set forth above as if fully set forth herein.

80.    Subsequent to the execution of the Severance Agreement, Last made omissions of then-present facts, including the facts that he had incorporated LNS, purchased the www.lastingnaturals.com domain name, purchased advertising materials, registered LNS with the PCPC, manufactured products using the Company's proprietary and confidential information and trade secrets, and sold those products to the Company's customers.

81.    Last's omissions of these then-present facts constituted misrepresentations of material facts.

82.    The Company justifiably relied on Last's misrepresentations of then-present facts, in that, among other things, it did not take action to enforce its rights against Last and LNS.

83.     Last intended the Company to rely on his misrepresentations of then-present facts, so that he could conduct his competing, infringing, and trade-secret misappropriating business undetected.

84.     As a result of Last's fraud, the Company has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     On the First Claim for Relief, an award of compensatory damages against Last in an amount to be determined at trial, but in no event less than $200,000;

B.     On the Second Claim for Relief, an award of compensatory damages against Last and LNS in an amount to be determined at trial;

C.     On the Third Claim for Relief, an award of compensatory damages against Last and LNS in an amount to be determined at trial;

D.     On the Fourth Claim for Relief, an award of compensatory damages against Last and LNS in an amount to be determined at trial;

E.     On the Fifth Claim for Relief, an award of compensatory damages against Last and LNS in an amount to be determined at trial;

F.     On the Sixth Claim for Relief, an award of compensatory damages against Last and LNS in an amount to be determined at trial;

G.     On the Seventh Claim for Relief, an award of compensatory damages against Last and LNS in an amount to be determined at trial;

H.     On the Eighth Claim for Relief, an award of compensatory damages against Last in an amount to be determined at trial;

I.     On the Eighth Claim for Relief, an award of compensatory damages against Last in an amount to be determined at trial;

J.     On all claims for relief, an award of punitive damages in an amount to be determined at trial;

K.     On all claims for relief, an award of reasonable costs and attorneys fees; and

L.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands a trial by jury as to all issues so triable.

Dated:   New York, New York
         May 20, 2008

HERRICK, FEINSTEIN LLP

By:_____
         John Oleske
2 Park Avenue
New York, New York 10016
Telephone:     (212) 592-1400
Facsimile:     (212) 592-1500
joleske@herrick.com
*Attorneys for Plaintiff At Last Naturals, Inc.*

Exhibit A

## SEVERANCE AGREEMENT AND GENERAL RELEASE

This Severance Agreement and General Release (this "Severance Agreement") is made as of the 22nd day of February, 2007, by and between Bruce Last ("Last"), an individual having an address at 187 Scarsdale Road, Crestwood, New York 10707, and At Last Naturals, Inc. (the "Company"), a New York corporation having an address at 401 Columbus Avenue, Valhalla, NY 10595.

WHEREAS, upon the terms and conditions set forth herein, Last will resign as President and Director of the Company, and his employment with the Company will terminate on February 22, 2007 (the "Termination Date");

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which is acknowledged hereby, and in consideration of the mutual covenants and undertakings set forth herein, the parties agree as follows:

1.     **Compensation and Benefits.**     In exchange for and in consideration of the covenants and promises contained herein, including Last's release of all claims against the Company and the Releasees (as defined in Paragraph 2) as set forth in Paragraph 2 below, the Company will provide Last with the following compensation and benefits:

A.     A lump sum payment of Fifty Thousand Dollars ($50,000), less applicable taxes and withholdings, payable by certified or bank check or by wire transfer of immediately available funds, six (6) months after the date of this Severance Agreement, on August 22, 2007.

B.     Subject to the terms and conditions provided for in the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), Last may, at his option, continue to be covered under his current group medical insurance plan for a certain period. Should Last elect to receive continued medical insurance coverage under COBRA, the Company shall continue to pay its portion of the insurance premium for twelve (12) months, beginning February 22, 2007 and ending February 21, 2008 to the same degree as though Last continued to be an employee of the Company. Last agrees that, in the event he becomes eligible to receive from another employer medical insurance which is substantially the same as his current group medical insurance, the Company shall have no obligation to continue its contributions. Last further agrees to promptly inform the Company if he becomes eligible to receive from another employer medical insurance which are substantially the same as his current group medical insurance. The Company's payments under this Paragraph shall not be construed as an agreement to fund Last's COBRA payments or to contribute to his medical insurance premiums, whether under COBRA or otherwise, after February 21, 2008.

2.     **General Release.**     In exchange for and in consideration of the covenants and promises contained herein (including, without limitation, the compensation and benefits provided in Paragraph 1 above), Last, on behalf of himself, his spouse, domestic partner, children, agents, assignees, heirs, executors, administrators, beneficiaries, trustees, legal representatives, and assigns, hereby waives, discharges, and releases the Company, any related entities, and the present and former shareholders, directors, officers, employees and representatives of all of them, as well as any Company's employee benefit plans and plan fiduciaries (the "Releasees"), from any and all actions, causes of action, obligations, liabilities,

{00039596.DOC.1}10272945.1

claims and demands Last may have, known or unknown, contingent or otherwise, and whether specifically mentioned or not, regardless of when they accrued until the date of this Severance Agreement. This release includes, but is not limited to, any claims based on Last's employment with the Company or the termination of that employment, including the release of any claims for wrongful discharge or breach of contract (express, implied or otherwise). This release includes, but is not limited to, any claims of alleged employment discrimination, harassment, or retaliation on any basis, including age, race, color, ethnicity, national origin, gender, religion, pregnancy, disability (or perceived disability), sexual orientation, veteran's status, whistleblower status or marital status. This release includes, but is not limited to, any claims Last may have under the Title VII of the Civil Rights Act of 1964, as amended; the Equal Pay Act; the Americans With Disabilities Act; the Age Discrimination in Employment Act; the Older Workers Benefit Protection Act; the New York State and New York City Human Rights Laws, or any other federal, state, or local laws or regulations, including any and all laws or regulations prohibiting employment discrimination, harassment, or retaliation. This release includes, but is not limited to, any claims for negligence, defamation or intentional tort. This release does not include a release of any rights Last may have to workers' compensation or unemployment benefits, or of any rights Last may have under this Severance Agreement, the Settlement Agreement dated the date hereof by, among others, the Company and Last (the "Settlement Agreement"), the Stock Purchase Agreement between Last and Fred and Stacey Rosen provided in the Settlement Agreement (the "Stock Purchase Agreement"), the Bill of Sale between Last and Fred and Stacey Rosen provided in the Settlement Agreement (the "Bill of Sale"), or the Amended and Restated Operating Agreement dated the date hereof of Lucky Tiger Manufacturing Company LLC (the "Operating Agreement"). Nothing in this Severance Agreement shall be construed to prohibit Last from filing a charge with or participating in any investigation or proceeding conducted by the Equal Employment Opportunity Commission or other federal, state or local agency. Notwithstanding the foregoing, Last agrees to waive his right to recover money damages or other relief personal to him in any charge, complaint or lawsuit filed by Last or by anyone else on his behalf but excluding claims under this Severance Agreement, the Settlement Agreement, the Stock Purchase Agreement, the Bill of Sale and/or the Operating Agreement.

3.    **Confidential Information.**

    A.    Last acknowledges that, during his employment with the Company, he has had access to or participated in the development of confidential or proprietary information and trade secrets related to the Company's business, including, without limitation, (i) formulas, patents, business plans, operating plans, marketing plans, strategic planning, financial reports, operating data, budgets, wage and salary rates, pricing strategies and information, terms of agreements with suppliers or customers and others, customer or client lists, devices, software programs, reports, banking records, litigation records, marketing information, information received from third parties under confidentiality conditions, correspondence, tapes, discs, electronic information and records, tangible property and specifications owned by or used in the Company's business, operating strengths and weaknesses of the Company's managers, officers, employees, agents, suppliers, clients and customers, and/or (ii) information pertaining to future developments, including, without limitation, research and development of products, services and processes, future marketing, distribution, delivery or sales plans or ideas, and potential new distribution or business locations, and (iii) other electronic, tangible and intangible property, that are used in the business and operations of the Company but not made publicly available

(collectively, the "Confidential Information"). The Confidential Information shall include any and all of the foregoing regardless of whether such Confidential Information is written, graphic, electronic, recorded, photographic or in any machine-readable form provided to Last.

B.    Last agrees that he will not directly or indirectly, disclose, use or make known for his or another's benefit any Confidential Information of the Company.

4.    **Return of Property; Reimbursement of Expenses.**    Last represents and warrants that he will return and deliver to the Company:  (i) all copies of data, information and knowledge, including, without limitation, all Confidential Information, documents, correspondence, notebooks, reports, computer programs, names of employees, clients, customers or consultants, and all other materials and copies thereof (including computer discs and other electronic media (including all deleted emails and files to the extent they are recoverable)) relating in any way to the business of the Company in any way obtained by Last during the period of his employment with the Company (especially, but not limited to, a listing of every and all contacts, including names, phone numbers, email addresses, actual physical address made by Last for sales and marketing purposes), and (ii) all tangible property of the Company in his possession including, without limitation, his lab coats, VOIP Telephone, Blackberry 8700c, Sony camcorder (with accessories and case), old advertisement book used for sales presentations and contents, any and all Lucky Tiger branded bottles, boxes and tins used for sales presentations, all Lucky Tiger original advertisements (including, but not limited to: all Esquire & Saturday Evening Post advertisements), tiger print rolling travel bag, Vintage Innerclean Display, Vintage Sulray box, lap top speakers, and Swiss Army laptop backpack.    Immediately upon the termination of Last's employment with the Company, Last shall be entitled to remove all his personal belongings located at the premises of the Company, including, without limitation, his books, Dell computer monitor, the wood shelving unit in the entrance to the main office of the Company, Cru-Butch wax tube Tiger print attaché case, three-drawer small dark wood organizer, lamp and decorations (antique coin bank and antique Asian paper weight).  The Company shall reimburse Last for all expenses incurred by Last up to the Termination Date, which reimbursement shall be due and payable on the date hereof.

5.    **Noncompetition and Nonsolicitation.**

A.    In exchange for and in consideration of the covenants and promises contained herein (including, without limitation, the compensation and benefits provided in Paragraph 1 above),  Last agrees that for a period of nine (9) months after the date of this Severance Agreement (the "Non-Competition Period"), he will not, directly or indirectly own (other than an entity in which Last has an interest of less than 1% and the securities of which are publicly traded), manage, operate, engage in, control, be employed by, advise, consult with or participate in or be connected with any entity owning or having a financial interest in, act as a lender to, whether direct or indirect, in a Competing Business (as defined below), except that:

i.    Notwithstanding any provisions herein to the contrary, Last's  agreement not to compete, directly or indirectly, with the Company for the business of, or solicit, Nickel Wu, or any entity related to or controlled by Nickel Wu, shall continue only until the earlier of:

a.    the time the following products now in the Company's inventory (the "<u>Inventory</u>") have been shipped to Nickel Wu and/or Last, and for which actual payment in the amount of $100,960.62 shall have been received by the Company from Nickel Wu and/or Last:

1.    Eva Cream (15,696 units at $5.36 per unit totaling $84,130.56);

2.    Hebe Time Magic Cream (2,496 units at $5.36 per unit totaling $13,378.56); and,

3.    Madiline Lotion (975 units at $3.54 per unit totaling $3,451.50);

OR

b.    the expiration of the Non-Competition Period

ii.    From and after the sale of the Inventory by the Company and the Company's receipt of $100,960.62 or the expiration of the Non-Competition Period, whichever is earlier, Last shall be free to sell to Nickel Wu (and/or any entities related to or controlled by Nickel Wu) any and all products in direct or indirect competition with the creams and lotions sold by the Company to Nickel Wu (and/or any entities related to or controlled by Nickel Wu) without any restrictions notwithstanding any provisions herein to the contrary.

For purposes of this Severance Agreement, a "<u>Competing Business</u>" shall mean any entity which develops, manufactures, distributes, or sells products which compete with those products developed, manufactured, distributed, or sold by the Company.

For purposes of this Severance Agreement, an "indirect" interest is presumed to exist if an interest is held by a spouse, life partner, parent or child, in addition to any other forms of indirect or beneficial interest.

B.    In exchange for and in consideration of the covenants and promises contained herein (including, without limitation, the compensation and benefits provided in Paragraph 1 above), Last agrees that for the Non-Competition Period, he will not, directly or indirectly, solicit current or past customers or clients of the Company for purposes of engaging in a Competing Business (except as otherwise permitted by Paragraph 5(A) above).

C.    In exchange for and in consideration of the covenants and promises contained herein (including, without limitation, the compensation and benefits provided in Paragraph 1 above), Last agrees that for the Non-Competition Period, he will not, directly or indirectly, solicit for employment, employ, engage, or advise or recommend to any other person or entity that such entity or person employ or solicit for employment, any person who is an employee of the Company as of the date of this Severance Agreement or who is an employee during the Non-Competition period.

D.    Last acknowledges and agrees that the payments set forth in Paragraph 1 are in part consideration for the covenants and agreements of Last set forth in this Paragraph 5. Last

further acknowledges and agrees that the provisions of Paragraph 5 are reasonable and properly required for the adequate protection of the business of the Company. Last represents and warrants that (i) the restrictive provisions of this Paragraph 5 will not substantially impair his ability to earn a livelihood, nor will such provisions cause Last undue hardship, and (ii) Last has fully and carefully read this Severance Agreement and has been advised by the Company to consult an independent attorney of his choice and that Last fully understands and agrees with the provisions of this Severance Agreement, including this Paragraph 5.

E.      If, at the time of enforcement of this Paragraph 5 a court shall hold that the duration, scope, geographic area or other restrictions stated herein are unreasonable under circumstances then existing, Last and the Company agree that the maximum duration, scope, geographic area or other restrictions deemed reasonable under such circumstances by such court shall be substituted for the stated duration, scope, geographic area or other restrictions.

6.      **Injunctive Relief.**      Last further acknowledges that damage to the Company from his breach of Paragraphs 5 of this Severance Agreement cannot be remedied solely by the recovery of damages, and Last agrees that in the event of any breach or threatened breach, in addition to and not in lieu of any other remedies or rights the Company may have at law, the Company shall have the right to immediate injunctive relief without the posting of any bond or other security.

7.      **Choice of Law.**      This Severance Agreement shall in all respects be interpreted, enforced and governed in accordance with and pursuant to the laws of the State of New York, excluding the conflict-of-law principles thereof. Any dispute arising out of, or related to, this Severance Agreement shall be brought in either the federal or state court in the State of New York, New York County.

8.      **Entire Agreement.**      This Severance Agreement constitutes the entire agreement of the parties hereto with respect to the matters contained herein. No modification or amendment of any of the provisions of this Severance Agreement shall be effective unless in writing and signed by both parties. No failure to exercise any right or remedy hereunder shall operate as a waiver thereof. No term or condition of this Severance Agreement shall be deemed to have been waived, nor shall a party be estopped from enforcing any provision of this Severance Agreement, except by a statement in writing signed by both parties. This Severance Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns. If any provision of this Severance Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, this shall not affect the validity or enforceability of any other provision hereof.

9.      **Assignment.**  Neither Last nor the Company may assign, transfer, pledge, encumber or otherwise dispose of this Severance Agreement or any of his or its respective rights or obligations hereunder, without the prior written consent of the other.

10.      **Review Period.** Last understands that the Company has given him a period of twenty-one (21) days to review and consider this Severance Agreement before signing it. Last further understands that he may use as much of this twenty-one day period as he wishes prior to signing. Last acknowledges that, to the extent that he decides to sign this Severance Agreement prior to the expiration of the above period, such decision was knowing and voluntary on his part. The

parties agree that any changes to this Severance Agreement, whether material or immaterial, do not restart the running of the twenty-one day period.

11.     **Revocation Period.**   Last may revoke this Severance Agreement within seven (7) calendar days of the date on which he signs it by delivering a written notice of revocation to the Company, c/o Fred Rosen, 401 Columbus Avenue, Valhalla, NY 10595, no later than the close of business on the seventh day after he signs and delivers this Severance Agreement to the Company.  If Last revokes this Severance Agreement, it shall not be effective or enforceable, and he will not receive the benefits described in Paragraph 1.

12.     **Headings.**     The paragraph and subparagraph headings contained in this Severance Agreement are for reference purposes only and shall not affect the construction or interpretation of this Severance Agreement.

13.     **Counterparts.**      This Severance Agreement may be executed in several counterparts, and all counterparts so executed shall constitute one agreement, binding on the parties hereto, notwithstanding that both parties are not signatory to the original or the same counterpart.  This Severance Agreement may be executed and delivered by facsimile, with such delivery to be as effective as delivery of an originally executed counterpart thereof.

YOU ACKNOWLEDGE THAT YOU HAVE CAREFULLY READ THIS SEVERANCE AGREEMENT AND GENERAL RELEASE, UNDERSTAND IT, AND ARE VOLUNTARILY ENTERING INTO IT OF YOUR OWN FREE WILL, WITHOUT DURESS OR COERCION, AFTER DUE CONSIDERATION OF ITS TERMS AND CONDITIONS.

AT LAST NATURALS, INC.                          ACCEPTED AND AGREED:


By:_____                     _____
    Fred Rosen                                      BRUCE LAST
    Title:


Date:_____                    Date:_____

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: LASTING NATURAL SOLUTIONS, INC.

Selected Entity Status Information

|  |  |
|---|---|
| **Current Entity Name:** | LASTING NATURAL SOLUTIONS, INC. |
| **Initial DOS Filing Date:** | MARCH 05, 2007 |
| **County:** | WESTCHESTER |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
LASTING NATURAL SOLUTIONS, INC.
187 SCARSDALE RD
TUCKAHOE, NEW YORK, 10707

**Registered Agent**
NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page   NYS Department of State Home Page

Exhibit C

# Better-Whois.com
## ...SEARCH ALL DOMAIN REGISTRARS

Home pa
Link-to-l
Contact l

# lastingnaturals.com is

# Reserved

**Status:**
clientDeleteProhibited
Status:
clientRenewProhibited
Status:
clientTransferProhibited
Status:
clientUpdateProhibited

**Registrar**: GODADDY.COM, INC.

Featured Re

Register a dom
with **Register.c**
only $20. Incluc

- Free starter w
- Free web forw
- Free e-mail fo
- Free domain l
- Name portfolic
manager
- Dynamic DNS

**Click here**
**discounted**

**Domain options / additional information:** *(Click below to expand)*

\+ if you own this domain...

\+ if you are trying to register/buy this domain...

\+ if you are researching this domain...

[Querying whois.verisign-grs.com]
[whois.verisign-grs.com]Whois Server Version 2.0Domain names in the .com and .net domains can now be registered
with many different competing registrars. Go to http://www.internic.net
for detailed information.   Domain Name: LASTINGNATURALS.COM
  Registrar: GODADDY.COM, INC.
  Whois Server: whois.godaddy.com
  Referral URL: http://registrar.godaddy.com
  Name Server: NS37.DOMAINCONTROL.COM
  Name Server: NS38.DOMAINCONTROL.COM
  Status: clientDeleteProhibited
  Status: clientRenewProhibited
  Status: clientTransferProhibited
  Status: clientUpdateProhibited
  Updated Date: 11-mar-2008
  Creation Date: 11-mar-2007
  Expiration Date: 11-mar-2009NOTICE: The expiration date displayed in this record is the date the
registrar's sponsorship of the domain name registration in the registry is
currently set to expire. This date does not necessarily reflect the expiration
date of the domain name registrant's agreement with the sponsoring
registrar.  Users may consult the sponsoring registrar's Whois database to
view the registrar's reported date of expiration for this registration.

Sponsored Link:

Domain Regi

Gabia, Inc.
Gandi SARL
GKG.net, Inc
Global Media Or
Inc.
Globedom
Go Daddy Softw:
IA Registry
I.D.R., Ltd.
INAMES Corp.
InterAccess Co.
Interactive Tel. N
Interdomain, SA
Internetters Limi
ItsYourDomain.c
Joker.com
Markmonitor
Melbourne IT Li

## Interested in acquiring this domain?

[Querying whois.internic.net]
[Redirected to whois.godaddy.com]
[Querying whois.godaddy.com]
[whois.godaddy.com]
The data contained in GoDaddy.com, Inc.'s WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy.  This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.

Any use of this data for any other purpose is expressly forbidden without the prior written
permission of GoDaddy.com, Inc.  By submitting an inquiry,
you agree to these terms of usage and limitations of warranty.  In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam.  You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" field.  In most cases, GoDaddy.com, Inc.
is not the registrant of domain names listed in this database.


Registrant:
   Domains by Proxy, Inc.

   Registered through: GoDaddy.com, Inc. (http://www.godaddy.com)
   Domain Name: LASTINGNATURALS.COM

   Domain servers in listed order:
     NS37.DOMAINCONTROL.COM
     NS38.DOMAINCONTROL.COM


   For complete domain details go to:
   http://who.godaddy.com/whoischeck.aspx?Domain=LASTINGNATURALS.COM

| www. | Search |
| --- | --- |
| Searches shared database registry and queries appropriate registrar. | |

Exhibit D

# Lasting Natural Solutions



## Product Development & Creative Thinking

Bruce Last
president

187 Scarsdale Road, Tuckahoe, NY 10707
ph: 914-806-1119   fx: 914-614-1033
e: bruce@lastingnaturals.com

Exhibit E

## About the Personal Care Products Council

### Who is the Personal Care Products Council

The Personal Care Products Council (formerly the Cosmetic, Toiletry and Fragrance Association) is the leading national trade association for the cosmetic and personal care products industry and represents the most innovative names in beauty today.

For more than 600 member companies, we are the voice on scientific, legal, regulatory, legislative and international issues for the personal care product industry. We are a leading and trusted source of information for and about the industry and a vocal advocate for consumer safety and continued access to new, innovative products.

### About the Personal Care Products Industry

Every day, millions of consumers around the world rely on personal care products to live better, healthier lives. From moisturizers, lipsticks and fragrances to sunscreens, soaps and anti-cavity toothpastes, these products are essential to today's consumer lifestyles. The personal care products industry is a global industry with more than $250 billion in annual retail sales.

### Committed to Safety and Science

Product safety is the top priority of the personal care products industry. We work diligently with our members to maintain the highest standards of safety rooted in science and cutting-edge research. Through self-regulation, the Council works to uphold and often surpass the most stringent U.S. consumer product safety standards. The Council has adopted a Consumer Commitment Code to formalize many existing product safety practices and to demonstrate its members' commitment to safety. The linchpin of our self-regulatory programs is the Cosmetic Ingredient Review (CIR) Expert Panel, an independent, nonprofit panel of world-renowned scientists and physicians established in 1976 to assess the safety of ingredients used in cosmetics in the U.S. with the support of the U.S. Food and Drug Administration and the Consumer Federation of America. Recognizing the enormous expense and inefficiency of duplicate safety testing on ingredients by member companies, the industry gathers worldwide published and unpublished safety data for review by the independent expert panel.

### Providing In-Depth Information

We recognize and value our position as a trusted, relied upon source of information about the global beauty industry. On any given day, beauty, trade and mainstream media depend on our organization for credible, accurate information about the personal care products industry and its products. For example, our website, **www.cosmeticsinfo.org**, provides in-depth information on ingredient safety and the safety assessment processes used on cosmetics and personal care product ingredients.

### Advocating for Consumer Safety

We are an active, vocal advocate for consumer safety. We work with the U.S. Food and Drug Administration (FDA) and federal, state, and local leaders to ensure quality and safety standards that protect the health of consumers and the environment. Our goal is to strengthen voluntary industry self-regulatory programs and promote uniform national regulatory standards.

### Pursuing Harmonized Global Regulatory Standards

The Council works to harmonize global regulatory practices for consumer products; to eliminate trade barriers; and to ensure a level playing field for all our member companies while instilling consumer confidence in product safety.

### Offering a Wide Range of Products and Services

The Personal Care Products Council offers a variety of valuable products and services to its members, from ingredient dictionaries, technical guidelines and database services to webinars, conferences and certificates of free sale. These resources are designed to ensure that our members have access to the latest information in order to grow and prosper in a competitive marketplace. Moreover, the Council's staff is available to answer member questions on regulatory, ingredient safety, and labeling matters, and to help members do business in the U.S. and abroad.

**Giving Back**

In 1987, the Council established a Foundation to fund the Look Good...Feel Better program, which helps cancer patients deal with the appearance-related side effects of treatment.

Back

Exhibit F

# Personal Care Products Council Active Members

**◊ Active**

**Active members** are manufacturers and distributors of finished products.

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

**J**

JD BENTLEY
Seattle WA 98102-9998

JAN MARINI SKIN RESEARCH, INC.
San Jose CA 95119

JELL-E-BATH INC.
Portland OR 97212

JHP, INC.
Norcross GA 30071

J. OSBORN & ASSOCIATES
Jasper AL 35501

JAFRA COSMETICS INTERNATIONAL, INC.
WestLake Village CA 91361

JESSICA MCCLINTOCK INC.
San Francisco CA 94103

JME (JIM MARKHAM ENTERPRISES)
Newport Coast CA 92657

JOAR LABORATORIES, INC.
Glendale CA 91204

JOHNSON DIVERSEY, INCORPORATED
Sturtevant WI 53177-0902

JOHNSON & JOHNSON CONSUMER PRODUCTS COMPANY
New Brunswick NJ 08933

JON DAVLER, INC.
City of Industry CA 91746

JUNE JACOBS SPA COLLECTION
New York NY 10111

JURLIQUE
New York, NY 10017

JUVENA INTERNATIONAL SA
SWITZERLAND

**K**

KANEBO LTD., NEW YORK
New York, NY 10012

KAO BRANDS COMPANY
Cincinnati OH 45214

KERSTIN FLORIAN INC.
Lake Forest CA 92630

KIMBERLY-CLARK CORPORATION
Neenah WI 54957

J. KING FORMULAS, INC.
Sequim WA 98382

KING RESEARCH, INC.
Brooklyn NY 11215

KINTECH USA
Santa Fe Springs CA 90670

CALVIN KLEIN COSMETICS CO.
Mount Olive NJ 07828

KLEO PARTNERS LTD. d/b/a/ BOSQ SKIN CARE
New York NY 10023

KOSE CORPORATION
Tokyo 103-8251
JAPAN

KOSMEDIX, INC.
San Francisco CA 94133

KRESSMAN LABORATORIES, INC.
Largo FL 33771

KRYOLAN CORPORATION
San Francisco CA 94103

L

L'OCCITANE
FRANCE

L'Oreal USA, Inc.
New York NY 10017

L'OREAL
Cedex
FRANCE

LABORATOIRE DR. RENAUD INC.
CANADA

LABORATOIRE ESTHEDERM
Fort Lauderdale FL 33311

LABORATOIRES DERMO-COSMETIK
CANADA

LABORATOIRES PBE
FRANCE

LASTING NATURAL SOLUTIONS, INC.
Tuckahoe NY 10707

LATITUDES INTERNATIONAL
Rancho Dominguez CA 90221

THE ESTEE LAUDER COMPANIES
New York NY 10153

LEVLAD INCORPORATED
Chatsworth CA 91311

LEXINGTON INT LLC
Boca Raton FL 33431

LIFEART PRODUCTS
Long Beach CA 90803

LIFOTECH RESOURCES, LLC
Chatworth CA 91311

LIMITED BRANDS
Columbus OH 43230

LINDI SKIN
Ardmore PA 19003

LING SKIN CARE
Brooklyn NY 11232

LION CORPORATION
Tokyo 130-8644
JAPAN

LIZ CLAIBORNE COSMETICS
New York NY 10018

JOS. H. LOWENSTEIN & SONS,
Brooklyn NY 11222

DR. MARY LUPO SKIN CARE PRODUCTS, INC.

New Orleans LA 70124

Back

Exhibit G

2007
# Who's Who
## MEMBERSHIP DIRECTORY







**CTFA**

Cosmetic, Toiletry, and Fragrance Association

Active Member Companies

23

**L.C.L.**
1, rue de L'Eau Vive
35133 Lecousse
FRANCE
011-33-1-2-8984409
FAX: 011-33-1-2-8984230
WEB: www.lcl-paris.com
EMAIL: info@lcl-paris.com
*Gilbert Harmony, Industrial Director
Products/Services:
• LCL produces and sells 2 cosmetic brands: Colin Paris, Du. Renaud Paris, 2 are skin care brands for beauty salons.
• LCL has an OEM activity.

**LA MER**
See THE ESTEE LAUDER COMPANIES INC.

**LABORATOIRE DR. RENAUD INC.**
See RENAUD SKIN CARE LABORATORIES, INC.

**LABORATOIRE ESTHEDERM USA**
5455 Cowpet Road
Annapolis, MD 2401
FAX: 410-224-5854
WEB: www.esthederm.com
*Karen McGuinness, Vice President
Products/Services:
Distributor of finished products.

**LABORATOIRES DERMO-COSMETIK INC.**
68 Stinson Street
Montreal, Quebec H4N 2E7
CANADA
514-735-7744
FAX: 514-735-2481
Products/Services:
Manufacturer of skin care products.

**LABORATOIRES P&E**
10, rue de la Paix
FRANCE
011-33-222292
011-33-222-622292
FAX: 011-33-222-622292
WEB: www.mansard.com
*Vichline Mansard, International Representative
Products/Services:
Cosmetic company selling face and body machines associated with face and body products to beauty salons and spas.

**LASTING NATURAL SOLUTIONS, INC.**
187 Scarsdale Road
Tuckahoe, NY 10707-2137
914-806-1119
FAX: 914-961-6540
*Brora Lathi, President
Products/Services:
Manufacturer/distributor of natural skin care products.

**LATITUDES INTERNATIONAL FRAGRANCES**
3105 E. Harcourt Street
Rancho Dominguez, CA 90221
310-638-3998
FAX: 310-638-3598
WEB: www.latitudesint.com
*Jill Belasco, President and Chief Executive Officer
Products/Services:
Manufacturer of fine fragrance, personal care components, and finished goods.

**THE ESTEE LAUDER COMPANIES INC.**
767 Fifth Avenue
New York, NY 10153
212-277-2277
Dana Hertzman Hudis, President
Dana Brestle, Chief Operating Officer
Also
767 Fifth Avenue
New York, NY 10153
212-572-4200
FAX: 212-572-6745
WEB: www.elcompanies.com
Leonard A. Lauder, Chairman of the Board, The Estee Lauder Companies Inc.
Patrick Bousquet-Chavanne, Group President
Ronald S. Lauder, Chairman of Clinique Labs, Inc.
Evelyn H. Lauder, Senior Corporate Vice President
William P. Lauder, Chief Executive Officer & President
Richard W. Kunes, Executive Vice President/Chief Financial Officer
Deborah Krulewitch, Assistant to the Chairman/Senior Vice President-Corporate Administration
Amy DiGeso, Executive Vice President-Global Human Resources
Roger Carascaapa, Executive Vice President-Global Communications
Sally Susman, Executive Vice President-Global Communications
Malcolm Bond, Executive Vice President-Global Operations
*Daniel J. Brestle, Chief Operating Officer, The Estee Lauder Companies, Inc.
Also
Fragrance, hair, shaving, bath, eye makeup, makeup, manicuring, and skin care preparations, personal cleanliness products.
Also
125 Pinelawn Road
Melville, NY 11747
631-531-1000
631-531-1287
FAX: 631-531-1127
Harvey Gedeon, Executive Vice President, Global Research & Development and Corporate Product Innovation
Also
350 S. Service Road
Melville, NY 11747
631-454-5403
Phil Barbato, Vice President, Global Environmental Affairs & Safety
**ARAMIS, INC.**
767 Fifth Avenue
New York, NY 10153
212-572-4200
Also
350 Rue Vendome
75001 Paris
FRANCE
Veronique Gabai-Pinsky, President
Patrick Bousquet-Chavanne, Group President

Also
**AVEDA CORPORATION**
4000 Pheasant Ridge Drive NE
Blaine, MN 55449
763-783-4000
WEB: www.aveda.com
Dominique Conseil, President
Patrick Bousquet-Chavanne, Group President
**BEAUTYBANK INC.**
555 Madison Avenue
New York, NY 10021
646-602-7500
Philip Shearer, Group President
Also
**BOBBI BROWN PROFESSIONAL COSMETICS**
575 Broadway
4th Floor
New York, NY 10012
646-613-6500
Bobbi Brown, Founder
Maureen Case, President
Patrick Bousquet-Chavanne, Group President
Also
**BUMBLE & BUMBLE**
415 W. 13th Street
4th Floor
New York, NY 10014
917-606-5000
Karl-Heinz Pitsch, Vice President/General Manager
Philip Shearer, Group President
Also
**CLINIQUE LABORATORIES, INC.**
767 Fifth Avenue
New York, NY 10153
212-572-3800
Cedric Prouve, Group President
Also
**ESTEE LAUDER INC.**
767 Fifth Avenue
New York, NY 10153
212-572-4200
Philip Shearer, Group President
Lynne Greene, Global President
Also
**DARPHIN**
111 Malden Lane, Suite 600
San Francisco, CA 94108
415-273-8000
Beth DiNardo, Senior Vice President, General Manager
Patrick Bousquet-Chavanne, Group President
Andre' Beret, President
Also
350 Rue Saint-Honore
75001 Paris
FRANCE
Veronique Gabai-Pinsky, President
Patrick Bousquet-Chavanne, Group President
Also
**ELC ONLINE INC.**
130 Prince Street
9th Floor
New York, NY 10012-2420
646-602-7500
Dennis McEniry, President
Also
**GLOSS.COM**
65 Bleecker Street
10th Floor
New York, NY 10012
646-602-7500
Dennis McEniry, President
Also
**JO MALONE LTD.**
767 Fifth Avenue
New York, NY 10153
212-572-4200
Maureen Cafe, President
Patrick Bousquet-Chavanne, Group President
**LA MER**
767 5th Avenue
New York, NY 10153
212-572-4200
**ESTEE LAUDER INTERNATIONAL, INC.**
767 Fifth Avenue
41st Floor
New York, NY 10153
Cedric Prouve, Group President
Also
**M.A.C. COSMETICS**
130 Prince Street
New York, NY 10012
Patrick Bousquet-Chavanne, Group President
Also
**THE DONNA KARAN COSMETICS**
767 Fifth Avenue
38th Floor
New York, NY 10153
212-572-4200
John Demsey, President
Also
**ORIGINS NATURAL RESOURCES, INC.**
767 Fifth Avenue
38th Floor
New York, NY 10153
212-572-4200
Philip Shearer, Group President
Also
**FIGUE**
767 Fifth Avenue
38th Floor
New York, NY 10153
212-572-4200
Daris Myers, President
Veronique Gabai-Pinsky, President, Aramis & Designer Fragrances
Patrick Bousquet-Chavanne, Group President

24

Active Member Companies

Exhibit H



150 East 42nd Street
New York, NY 10017
Telephone: (212) 370-1300
Facsimile: (212) 370-7889
www.egsllp.com

RICHARD P. KAYE
E-mail: rkaye@egsllp.com
Direct Fax: 646-895-7214

April 28, 2008

*Via E-Mail, Facsimile and Regular Mail*

**WITHOUT PREJUDICE BUT SUBJECT TO SUBMISSION TO COURT SHOULD THE OCCASION ARISE**

John Oleske, Esq.
Herrick Feinstein LLP
2 Park Avenue
New York, New York 10016

Re:     At Last Naturals, Inc. and Lucky Tiger Manufacturing Company LLC

Dear John:

Following up on our telephone conversation last Friday, I am taking this opportunity to respond to your letter dated April 21, 2008. As I informed you when we spoke, I was on vacation for most of last week and then, immediately upon my return, was involved in dealing with a number of "emergencies" in other matters.

While, therefore, I appreciate *your* professional courtesy and patience, I must say that your letter reflects the fact that your clients continue to harbor a good deal of paranoia, self-righteousness and a propensity to making unfounded allegations, or at least, to having vivid imaginations. While it would be almost entertaining to see a lawsuit(s) initiated by Mr. Rosen fall on its face, we prefer to defuse the entire situation based upon the actual facts, rather than perpetuating this silly, fear-driven melodrama.

Mr. Last did form a company called "Lasting Natural Solutions, Inc." ("LNS") in or about March, 2007. Mr. Last did not, however, operate that company at any time, in any manner, directly or indirectly, prior to December, 2007 – well after the expiration of the non-competition period set forth in paragraph 5 of the Severance Agreement and General Release between our respective clients (the "Severance Agreement"). Furthermore, for your information, as a matter of fact LNS wound up engaging in but one (1) single transaction, in or about December, 2007 involving a single sale in an amount somewhat less than $14,000.00.

{00075014.DOC.1}

Ellenoff Grossman & Schole LLP

John Oleske, Esq.
Herrick Feinstein LLP
April 28, 2008
Page 2

If you or your client "clicks" on the web address www.lastingnaturals.com, you will see that the website is "under construction". It has never been operational nor does my client (or his wife) have any intention of creating or running the website. In the first instance it was a provisional idea; in the actual event it was effectively abandoned. Please let me know if your client has an interest in buying the LNS name.

Given these circumstances, the speculation in your letter to the effect that Mr. Last's alleged breaches "undoubtedly extend beyond the mere founding of [LNS], and include unauthorized us of At Last's confidential and proprietary information in connection with that competing business" is simply incorrect. Furthermore, we have no intention of "proving a negative" to reassure Mr. Rosen or disabuse him of his fears.

As yet another example of your client's runaway imagination and rampant accusations, I note that your letter was apparently inspired by Mr. Rosen (or, perhaps, his wife) stumbling upon an LNS business card while they visited the home of Mr. Last's parents.

First, I point out that neither Mr. Last nor his wife are working at LNS. Indeed, *no one* works at or for LNS. That company is presently dormant and is expected to remain so. Indeed, as mentioned above, it was operated for only a very brief time *after* the end of the non-competition date. The fact that Mr. Last's LNS business card reflected the same phone number he used while he was affiliated with At Last is meaningless. I see no reference to Mr. Last's cell phone number and its use in either the Severance Agreement or the related Settlement Agreement. Even though I have not yet devoted time to reviewing this entire, large file, you will recall that we specifically discussed the cell phone number and we were never willing to cease use of it because it was Mr. Last's long-time cell phone number. In any event, there was and is no restriction on his use of that number, and he continues to use it in his personal life to this day.

Both Mr. Last and his wife and presently employed in separate and distinctively different businesses having nothing whatsoever to do with the business, products and/or services offered by At Last and your client. Under the circumstances, and since Mr. Last's old LNS business card is little more than a souvenir (by the way, I've saved one sample of every business card from every law firm by which I was ever employed) of past endeavors, I hardly think it is necessary or appropriate to even address your statements about logos, "intentional trademark infringement" and "unfair business practices". There are no such infringements and Mr. Last has no realistic exposure to the remedies you threaten. Although Mr. Last used his LNS card in an appropriate manner for a very short time, and no longer utilizes the cards for the reasons set forth below, I am enclosing a photocopy of his LNS card and his former At Last business card which, in my view, rebuts the "trademark infringement" allegations set forth in your letter albeit the debate is, at worst, an academic one.

{00075014.DOC.1}

Ellenoff Grossman & Schole LLP

John Oleske, Esq.
Herrick Feinstein LLP
April 28, 2008
Page 3

To sum up, and with respect to the seven (7) enumerated demands set forth in your letter, I comment as follows in summary fashion:

1)    Not necessary or required.
2)    Website is not "up" and never has been; not necessary or required.
3)    Mr. Last is and was entitled to retain and use his cell phone number.
4)    None exists.
5)    Mr. Last does not own, operate or participate in any even remotely competing business. He is a participant, as an employee, in a totally unrelated business and industry. We will not identify that company since we do not trust Mr. Rosen to not interfere with Mr. Last's life in some malicious manner (yes, fear is a two way street). Likewise, Mr. Last's wife is an employee of a business in a totally unrelated industry.
6)    Approximately $13,800 derived from a single transaction in December, 2007, after the termination of the non-compete period.
7)    None do; not happening; see above.

Now let's address your clients' obligations pursuant to Article IV of the Amended and Restated Operating Agreement of Lucky Tiger Manufacturing Company LLC (the "Operating Agreement") which provides for the possibility of distributions to Mr. Last. It has been well over a year since the parties entered into the various agreements, including the Operating Agreement, and your clients have failed to provide Mr. Last with any information whatsoever regarding the business, profits and distributions, if any, pertaining to Lucky Tiger. Please have them do so in the immediate future, including appropriate supporting documentation such as statements of profit and loss; tax return(s) and balance sheets.

Thank you for your expected cooperation.

Very truly yours,

Richard P. Kaye

enclosure
cc.: Mr. Bruce Last

{00075014.DOC.1}

NEW CARD



**Lasting Natural Solutions**

Product Development
& Creative Thinking

Bruce Last
president

187 Scarsdale Road, Tuckahoe, NY 10707
ph: 914-806-1119   fx: 914-614-1033
e: bruce@lastingnaturals.com



FRONT

BACK



at last
naturals

bruce last
president

401 Columbus Avenue, Valhalla NY 10595
Phone: 914.747.3591  Fax: 914.747.3791
E-Mail: bruce@atlastnaturals.com
www.atlastnaturals.com • www.getluckytigee.com

OLD CARD

Exhibit I

**Oleske, John**

From: Blast [mailto:blast2@optonline.net]
Sent: Wednesday, March 26, 2008 9:53 PM
To: 'Tonia Fountain'
Subject: FW: msnbc.com video: Dog 'prays' at Zen temple

How are you doing sweetheart??? Haven't heard from
you in a long time, hope all is well with you and Steph!
Things are great on my end- really great- my biz is rocking…finally!
Just back from Bermuda!  Im darker than you! Going skiing to Colorado
with the old crew boyz…Rob, Nowel, Ralph and Bernie! First time in 4 years!
Kat & Luna send their best!

Check out this video

   http://www.msnbc.msn.com/id/21134540/vp/23779920#23779920
<http://www.msnbc.msn.com/id/21134540/vp/23779920#23779920>

   image[1]

1



RECYCLED



150 East 42nd Street
New York, NY 10017
Telephone: (212) 370-1300
Facsimile: (212) 370-7889
www.egsllp.com

RICHARD P. KAYE
E-mail: rkaye@egsllp.com
Direct Fax: 646-895-7214

May 2, 2008

*Via E-Mail, Facsimile and Regular Mail*

**WITHOUT PREJUDICE FOR SETTLEMENT PURPOSES ONLY**

John Oleske, Esq.
Herrick Feinstein LLP
2 Park Avenue
New York, New York 10016

> Re:    At Last Naturals, Inc. and Lucky Tiger Manufacturing Company LLC

Dear John:

I respond as follows to your letter of April 30, 2008:

1.    First, regardless of what you and/or your client consider "reasonable to believe", my client formed Lasting Naturals in March, 2007 only in anticipation of utilizing that entity *after* the expiration of the non-compete period, which, by the way, is the only way it was utilized. How and when he spends his money is his business (no pun intended).

2.    Second, my client insists that the product (not products) sold (the only sale to date) was *not* formulated using your client's proprietary and confidential. Furthermore, I am informed that the product composition is largely "generic" and left to the actual manufacturer to formulate for At Last or any company for that matter. For your information, my client delegated production to a production facility which had no connection to or experience with At Last. Since there was only one sale, there has also been only one (1) production "run".

3.    Third, my client did, indeed, join the Personal Care Products Council ("PCPC") spending $662.00 for a membership which he found largely worthless to him. He continues to be actively solicited for renewal of that membership by PCPC and, since he has no intention of renewing and is no longer involved in this business,

{00075014.DOC.2}

Ellenoff Grossman & Schole LLP

John Oleske, Esq.
Herrick Feinstein LLP
May 2, 2008
Page 2

he has ignored those solicitations. He is, apparently, still listed as an "active member" by virtue of his as yet unexpired, but soon to expire, membership. PCPC manages its membership roll, not my client.

4.   Fourth, my client's use of the words "my biz is rocking...finally" in the e-mail was, in fact, a reference to his current, totally unrelated employment. To be frank, I have appropriately chastised and cautioned him that his transmittal with the Lasting Natural's business card to "bait" Mr. Rosen was, to be sure, stupid. Actionable: NO. Manipulative and foolish: YES. I wish he had spoken with me first; but he didn't. He no longer uses the business card.

5.   Fifth, I disagree with your trademark contentions, all the more so because it is all irrelevant as a practical matter. However, and without prejudice and solely for the purpose of underscoring my position, your client can have the domain name so long as you prepare the paperwork for our signing at your client's expense. We're not doing it.

6.   Seventh, my client confirms that the cell phone number is not being used to conduct any business in contravention of the Severance Agreement.

7.   Eighth, to be frank, I misread your initial request for documents relating to Lasting Naturals. However, having acknowledged that, I see no relevance to producing documents except as specified hereafter. You already know, and my client readily acknowledges, formation of the company. We are not agreeing to dissolution because it is not being operated in any way. However, I will concede relevance to substantiating the single sale previously acknowledged and, to that end, am authorized to represent to you that we will, in due course and when it is filed, provide you with Lasting Naturals' first and only corporate income tax return, since its fiscal circumstances are arguably relevant to rebut your client's allegations and to substantiate our own statements. For your information, the company is on extension for this filing but it is expected to be accomplished at some point over the next couple of months. When I have them in hand, I will also provide you with the document evidencing the single sale of goods.

8.   Ninth, my client is employed by a company in the educational industry. As previously stated, he is not involved in any competing business (although, as you know, he is entitled to be at this time).

9.   Tenth, with respect to your reference to the "LinkedIn" page on the website, I am informed that it is a social/networking website and that Mr. Last participates in it

{00075014.DOC.2}

Ellenoff Grossman & Schole LLP

John Oleske, Esq.
Herrick Feinstein LLP
May 2, 2008
Page 3

in his personal name, not as a business. Mr. Rosen's monitoring and dissatisfaction with Mr. Last's content at that social website (much like MySpace), with respect to a onetime reference to "consumer products" as a vocation, is, well, I'll leave it to you to characterize it. But my client is not going to submit to having his personal and private life scrutinized and manipulated by anyone. More relevantly, when I search "Lasting Natural Solutions" and "Natural Solutions" through Google, I do not come up with my client's website. When I input www.NaturalSolutions.com I come up with an unrelated California company. When I input www.lastingnaturalsolutions.com I come up with nothing. And when I input www.lastingsolutions.com all I get is the generic message "this website is coming soon."

10.     Eleventh, the corporate income tax return and purchase order relative to the single sale of product made by Lasting Naturals in December, 2007 will document the revenue earned by the company. However, and without perpetuating the so-called "name calling", we are not going to be devoting endless time and energy to satisfying your client's fears which, as further explained above, remain off base (with the caveat, as I note above, that Mr. Last did fuel Mr. Rosen's suspicions with that silly "biz rocking" e-mail).

11.     Finally, and to my last point, Ms. Kekona's e-mail containing a statement to the effect of seeking a "computer expert" to work on "our site" is actually a reference to her own, new employer's website – again, in an unrelated industry. It is not a reference to a Lasting Naturals website. That's what I mean by runaway imaginations underlying inaccurate allegations.

My clients do not intend to spend their time, energy and money providing ongoing reassurances to Mr. Rosen, who they (and I assume this is a reciprocal desire), want nothing more than to have out of their lives. However, it is, indeed, a two-way street and I have made it crystal clear to my Mr. Last that his provocation of Mr. Rosen is directly contrary to that desire; foolish; unproductive and, frankly, unacceptable to me, as his attorney. If Mr. Rosen wants to continue to read the tealeaves of e-mails that he manages to procure from/to my clients, I wish him well with his new hobby.

Ellenoff Grossman & Schole LLP

John Oleske, Esq.
Herrick Feinstein LLP
May 2, 2008
Page 4

     Having said that, there are only so many hoops that we are willing to jump through to satisfy Mr. Rosen, and those hoops are specified above.  What further assumptions Mr. Rosen elects to make and act upon are his prerogative.

Very truly yours,

Richard P. Kaye

cc.:  Mr. Bruce Last

{00075014.DOC.2}

Exhibit K

## Oleske, John

| | |
|---|---|
| **From:** | Millington, Hunter [Hunter_Millington@ziffdavis.com] |
| **Sent:** | Wednesday, March 19, 2008 3:35 PM |
| **To:** | bruce@alast.com |
| **Subject:** | The Bruce Last Evaluation |

Yo. Here's what I sent to Jerry. Am I a good bull-shitter or what !

Hi Gerard ,

**My name is** Hunter Millington
**I've known Bruce** for about 7 years
**He's a** good friend
**The most important personal characteristics that recommend him are :** Honesty, Smarts, Humor, Compassion, Perceptiveness, Attractiveness and Trustworthiness
**Please describe a time when I have observed a strength that Bruce has over-used :** Hmmmm. I could tell you about a dozen characteristics like that for myself, but I'm hard-pressed to do the same for Bruce – although the question gets to the core of why Bruce is a friend and would make a good employee : Balance. Bruce is a very steady, level-headed guy - not Stepford Wife steady, more like : "Let's think carefully about this and make the right decision" – steady. I think it comes from years spent running his own business and dealing with challenges on the fly.
**Anything else ?** Yes. I think you can tell a lot about a person by whom they choose to spend their life with. Bruce's wife Kate is a smart, funny, wonderful person. Together they make a solid, happy couple who adore each other. It's an important part of who Bruce is, and it's a big part of what drives him and what makes him both a caring, thoughtful person and, I would argue, a dedicated employee.

Hunter Millington
Mid-Atlantic Sales Manager
**PCMag Network** : PCMagazine, PCMag.com & Digitallife
212-503-5422
    -----Original Message-----
    **From:** Gerard Major [mailto:gerard@confidentialpractices.com]
    **Sent:** Tuesday, March 18, 2008 5:39 PM
    **To:** Millington, Hunter
    **Cc:** brucelast1@yahoo.com
    **Subject:** Bruce Last

## CONFIDENTIAL PRACTICES INCORPORATED
### *Organizational Effectiveness Consultants*
One Lincoln Plaza
New York, NY 10023
Tel:212-877-2300 Fax:212-877-2676
www.confidentialpractices.com

March 18, 2008

Candidate: Bruce Last

Client Company: JMH Education

We have been asked by our client to assist in the evaluation of this candidate. We want to clearly understand the potential employee's nature and how he or she will relate to both our client and the job responsibilities. The applicant has told us you know her or him well enough to

help us gain this understanding. It will benefit the candidate as well as our client if the position and the organization are the right fit.

Your name:

How long have you known the applicant?

In what capacity do you know him/her (friend, manager, co-worker, etc.)?

What would you say are the most important personal characteristics that recommend him or her?

We are aware of many of the candidate's strengths. However, any strength that is over-used can become a liability. Aggressiveness and frugality are examples of strengths that become limitations if carried too far. Each of us at times has over-used one of our strengths. Please describe a time when have you observed this in the person being considered.

What else do you think we should know about this person?

Sincerely,


Gerard Major 212-877-2300 ext 706
Gerard@confidentialpractices.com

Exhibit L

Int. Cls.: 3 and 5

Prior U.S. Cls.: 1, 4, 6, 18, 44, 46, 50, 51, and 52

**United States Patent and Trademark Office**

Reg. No. 2,543,591

Registered Feb. 26, 2002

## TRADEMARK
### PRINCIPAL REGISTER

## AT LAST NATURALS

AT LAST NATURALS, INC. (NEW YORK COR-
PORATION)
401 COLUMBUS AVENUE
VALHALLA, NY 10595

FOR: HAIR CARE PREPARATIONS, NAMELY,
SHAMPOO, CONDITIONER, HAIR SPRAY, AND
STYLING GEL; SKIN CARE PREPARATIONS,
NAMELY, BODY CREAM, HAND CREAM, SKIN
LOTION, BODY LOTION, FACIAL LOTION, FA-
CIAL SCRUBS, MOISTURIZERS, SOAP, SHOWER
GEL, BATH GEL, AND BATH OIL; SUNTAN LO-
TION; TOOTHPASTE; MOUTHWASH, IN CLASS 3
(U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 1-1-2001; IN COMMERCE 1-4-2001.

FOR: DIETARY SUPPLEMENTS, HERBAL SUP-
PLEMENTS, VITAMIN AND MINERAL SUPPLE-

MENTS, HERBAL EXTRACTS AND TINCTURES,
TOPICAL ANALGESICS, TOPIC ANESTHETICS
FOR NON-SURGICAL USE, LAXATIVES, FUNGAL
MEDICATIONS, ANTISEPTICS, ACNE TREAT-
MENT PREPARATIONS, IN CLASS 5 (U.S. CLS. 6,
18, 44, 46, 51 AND 52).

FIRST USE 1-4-2001; IN COMMERCE 1-4-2001.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "NATURALS", APART FROM THE
MARK AS SHOWN.

SN 76-144,491, FILED 10-11-2000.

LAKEISHA HARRISON, EXAMINING ATTORNEY

**Int. Cls.: 3 and 5**

**Prior U.S. Cls.: 1, 4, 6, 18, 44, 46, 50, 51 and 52**

Reg. No. 2,618,018

## United States Patent and Trademark Office

Registered Sep. 10, 2002

### TRADEMARK
### PRINCIPAL REGISTER



AT LAST NATURALS, INC. (NEW YORK COR-
PORATION)
401 COLUMBUS AVENUE
VALHALLA, NY 10595

FOR: HAIR CARE PREPARATIONS, NAMELY,
SHAMPOO, CONDITIONER, HAIR SPRAY, AND
STYLING GEL; SKIN CARE PREPARATIONS,
NAMELY, BODY CREAM, HAND CREAM, SKIN
LOTION, BODY LOTION, FACIAL LOTION, FA-
CIAL SCRUBS; MOISTURIZERS, SOAP, SHOWER
GEL, BATH GEL, AND BATH OIL; SUNTAN LO-
TION; TOOTHPASTE; MOUTHWASH, IN CLASS 3
(U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 1-4-2001; IN COMMERCE 1-4-2001.

FOR: DIETARY SUPPLEMENTS, HERBAL SUP-
PLEMENTS, VITAMIN AND MINERAL SUPPLE-
MENTS, HERBAL EXTRACTS AND TINCTURES,
TOPICAL ANALGESICS, TOPICAL ANESTHETICS

FOR NON-SURGICAL USE, LAXATIVES, FUNGAL
MEDICATIONS, ANTISEPTICS, ACNE TREAT-
MENT PREPARATIONS, IN CLASS 5 (U.S. CLS. 6,
18, 44, 46, 51 AND 52).

FIRST USE 1-4-2001; IN COMMERCE 1-4-2001.

OWNER OF U.S. REG. NO. 2,543,591.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "NATURALS", APART FROM THE
MARK AS SHOWN.

THE MARK CONSISTS OF THREE LEAVES, A
BIG LEAF IN THE MIDDLE AND TWO SMALLER
LEAVES ON THE SIDES.

SER. NO. 76-328,589, FILED 10-22-2001.

LOURDES AYALA, EXAMINING ATTORNEY